| | |
|---|---|
| HENNEPIN COUNTY | DISTRICT COURT |
| STATE OF MINNESOA | FOURTH JUDICIAL DISTRICT |

Aaron Olson,

        Plaintiff,

        Court File No. 27-CV-19-504

v.

**SUMMONS**

Skateville, Inc.,

        Defendant.

---

You are hereby summoned and required to serve upon the undersigned an Answer to the Amended Complaint, which is herein served upon you within twenty (20) days of service of said Amended Complaint, exclusive of the date of service. If you fail to do so, judgment by default will be taken against you in the amount demanded in the Amended Complaint.

Dated: January 10, 2019

*[signature]*

Aaron Olson, Plaintiff in Propria Persona
114 5th St. S.E.
Holms-Greenway Building
Apt. 502
Minneapolis, MN 55414

DAKOTA CO SHERIFF
HASTINGS MN

2019 JAN 11  A 8: 11

District Court of Hennepin County
State of Minnesota

# COMPLAINT

| | | |
|---|---|---|
| Aaron Olson, | | Case No. 27-CV-19-504 |
| | Plaintiff, | |
| | | **Claims of Discrimination Pursuant to Minn.** |
| v. | | **Stat. § 363A, The Minnesota Human Rights** |
| | | **Act; The Americans with Disabilities Act;** |
| Skateville Inc., | | **The Federal Civil Rights Act; and Claims of** |
| | Defendant. | **Negligence, Intentional Infliction of Emotional** |
| | | **Distress & Defamation of Character** |

**\*DEMAND FOR JURY TRIAL**

---

1.) Plaintiff is a resident of Hennepin County.

2.) Plaintiff will show here a prima facie case of ongoing discrimination and discriminatory harassment, as well as negligence on the part of Defendant toward Plaintiff. See *Giuliani v. Stuart Corp.*, 512 NW 2d 598, Minn: Court of Appeals (1994), at 593. Plaintiff will also show that "at least one incident of [discrimination] occurred within the (statute of) limitations period". See Id. at 595.

3.) Minnesota state courts have jurisdiction to decide ADA claims, see *In re*

*Frickey*, 515 NW 2d 741, Minn: Supreme Court (1994), and "In *Faibisch*[1], [the 8th Circuit Court of Appeals] held that Minnesota's six-year limitations period for personal injury actions applied to plaintiff's Rehabilitation Act claim. 304 F. 3d at 802. Because the ADA and the Rehabilitation Act enforce the same substantive rights, [this Hennepin County District Court must] conclude that the six-year limitations period of Minn.Stat. § 541.05 applies to [this instant plaintiff's] ADA claim[s] as well." See *Gaona v. Town & Country Credit*, 324 F. 3d 1050, Court of Appeals, 8th Circuit (2003), at 1056.

4.) Minnesota state courts also have jurisdiction to decide federal Civil Rights Act claims. See *Yellow Freight System, Inc. v. Donnelly*, 494 US 820, Supreme Court (1990). The statute of limitations for a federal Civil Rights Act claim is six years. See *Egerdahl v. Hibbing Community College*, 72 F. 3d 615, Court of Appeals, 8th Circuit (1995), at 617.

5.) Plaintiff will now detail an escalating series of acts conducted by Defendant that constitute illegal discrimination and various torts against Plaintiff. Respondeat superior applies.[2]

6.) On Friday, August 12, 2016, Plaintiff went to the Skateville roller skating facility – at 201 River Ridge Cir S, Burnsville, MN 55337 – with his daughter and two of her friends. All three teenagers were wearing Islamic head coverings.

---

[1] *Faibisch v. University of Minnesota*, 304 F. 3d 797, Court of Appeals, 8th Circuit (2002).

[2] "[A]n employer is vicariously liable for the torts of an employee committed within the course and scope of employment." See *Schneider v. Buckman,* 433 N.W.2d 98, Minnesota Supreme Court (1988), at 101.

Upon entering, Plaintiff and the three girls, hereinafter "Plaintiff's group", waited at the roller skate desk to receive rental skates, where the workers behind the counter kept assisting other customers who clearly came after Plaintiff's group, until Plaintiff finally asked politely to be helped next. One counter worker then gave Plaintiff a hostile look and then went into the locker room area and asked another worker to get skates for "those Muslim people". Plaintiff's group clearly overhead the conversation and it was very much unsettling to them, however had encountered similar treatment[3] before and tried not to react to it, knowing that if they addressed every encounter they experienced based on religious bias, they would be spending an inordinate amount of time trying to correct what is unfortunately a prevalent problem, with very little effect and great difficulty gaining compensation for all but the most egregious acts. For this reason, Plaintiff's group opted to get their skates as quickly as possible without complaint and attempt enjoyment at the facility that they had paid to use.

7.) While skating that night at Skateville, Plaintiff was impressed by the skating of people who identified themselves as "club members". Upon leaving, Plaintiff then researched the Skateville website and contacted Skateville staff via email to find out more information on its skating club. By the end of August 2016,

---

[3] See *State by Beaulie v. Mounds View*, 518 NW 2d 567, Minnesota Supreme Court (1994), at 573: "[W]e conclude that a reasonable fact finder could find that defendants maliciously discriminated against [Plaintiff] in violation of Minn. Stat. § 363.[A12] (renamed) by treating Plaintiff in a manner so at variance with what would reasonably be anticipated absent discrimination, that discrimination is the probable explanation."

Plaintiff had purchased new skates through Skateville[4], along with other skating gear, and had joined its skating club, whose president is also the primary manager at Skateville, Florance Adams. Although Plaintiff did not sense any overt religious bias from Ms. Adams initially, she did make mention to Plaintiff on August 13, 2016 that she had seen him at his first Skateville attendance with the "three young ladies", who again were wearing Islamic clothing.

    8.) Plaintiff regularly attended classes and skating sessions at Skateville up through the end of 2017, and attended multiple skating competitions there. However by the summer of 2017, Plaintiff began to suffer illegally discriminatory and harassing treatment based on his perceived religion and later his disability by Skateville staff that began the unraveling of their relationship, culminating in a trespass notice given to Plaintiff by police on February 2, 2018 at Defendant's request. Some of the discrimination Plaintiff endured occurred over a year ago, and

> "[c]laims brought under the Human Rights Act must be
> filed within one year of the alleged discriminatory act.
> Minn.Stat. § 363.06, subd. 3 (1990). An exception to this
> rule is the doctrine of continuing violations — 'the unlawful
> employment practice manifests itself over time, rather than

---

[4] Plaintiff purchased a pair of Sure Grip brand roller skates from Defendant on September 18, 2016. See Plaintiff's proposed Exhibit 1, https://www.suregrip.com/category-s/157.htm, proof that Sure Grip is a manufacturer based in California. Defendant's "customary 'sources of entertainment . . . move in commerce.'" See *Daniel v. Paul*, 395 US 298, Supreme Court (1969), at 308.

> as a series of discrete acts.' *Lane,* 775 F.Supp. at 1224; *see also Hubbard*, 330 N.W. 2d at 440-41 n. 11. To establish a continuing violation, a plaintiff must show that at least one incident of harassment occurred within the limitations period. *Lane,* 775 F.Supp. at 1224."

Defendant's most violating act occurred on February 2, 2018, when it trespassed Plaintiff from its premises and banned him from its club membership for underlying reasons of religion and disability, which makes this complaint timely for prosecution under all the legal theories stated in Plaintiff's captioning. See *Daniel v. Paul*, 395 US 298, Supreme Court (1969). See also *Roberts v. United States Jaycees,* 468 US 609, Supreme Court (1984).

9.) On September 1, 2017, Florance Adams, the primary Skateville manager and Skateville's skating club president was complaining to the skating coach Chris Morgan in front of Plaintiff of the private event Skateville had rented out their facility for that day, which was a gathering of Muslim people for the celebration of their religious holiday. She stated during her complaints that she believed Muslim people "washed themselves with toilet water" while looking at Plaintiff. Plaintiff then politely responded by stating he did not believe that to be the case. Ms. Adams then turned to Plaintiff and asked him, "Are you one of them?" Plaintiff responded that he "was with them", which meant he was supportive of Muslims having the right to celebrate their religious holiday without disparagement. Interpreting that to mean Plaintiff was himself a Muslim, Ms. Adams then adjusted her arms in the Islamic prayer positions and stated to

Plaintiff, "Then you know what all that (intentionally unintelligible utterances) means?" Being shocked that Ms. Adams was mocking the Muslim prayers in front of him[5], he attempted to soothe the situation by changing the subject. In a place of public accommodation however, Plaintiff should not have had to endure "hostile questions meant to embarrass" him because of his perceived religion or religious associations. See attached *Rumble v. Fairview Health Services*, Dist. Court, Minnesota (2015). When Plaintiff arrived home later that night, he tried to justify Ms. Adam's acts to himself as ignorance and wrote her an email politely giving suggestions on how she could more effectively address problems she was having with the Muslim community.

10.) On October 1, 2017, Plaintiff disclosed to the floor guard at Skateville, who goes by the name Magenta/Majentah Bloom, that he suffers from anxiety and post traumatic stress disorder when she was at his apartment for a social gathering. Ms. Bloom had stated she had anxiety but that people with post traumatic stress disorder (PTSD) "are a whole 'nother level of crazy", referring to a former boyfriend of hers who she stated physically abused her, and who was apparently diagnosed with PTSD. Plaintiff made his disclosures to Ms. Bloom to allay her insecurities in having anxiety and to correct the notion that there is even a correlation between PTSD and violence.

11.) There is not an exact date of dispute but throughout October and early

---

[5] "Mindless antipathy of one person toward another of different race, religion, gender, or marital status is repugnant to anyone who claims to be civilized." See *State By McClure v. Sports & Health Club*, 370 NW 2d 844, Minn: Supreme Court (1985), at 875.

November 2017, disagreements between Plaintiff and Ms. Bloom slowly developed outside of Skateville, in a social relationship that had formed between the two.  Again, the disagreements at this time between Plaintiff and Ms. Bloom had virtually nothing to do with Skateville, although when Plaintiff counseled Ms. Bloom on the criminal illegality she was involved in with doing certain things that generally did not involve Plaintiff, Plaintiff was disturbed by how various Skateville staff, especially the primary skating coach there, Chris Morgan, appeared to be encouraging Ms. Bloom's harmful and illegal behavior.  Plaintiff hoped to maintain some level of contact with Ms. Bloom, largely outside of Skateville, if for no other reason than to try to counteract some of what Plaintiff perceived as negative influences from Skateville staff, without bringing himself into direct conflict there and making the Skateville environment anymore uncomfortable than it had already become for Plaintiff.

12.) On November 18, 2017, Skateville's primary skating coach, Chris Morgan, who is also close friends with Magenta/Majentah Bloom, began loudly and aggressively interrogating Plaintiff in front of other staff and patrons at Skateville over statements made by a "Muslim" music celebrity in the 1980s, according to Mr. Morgan to endorse the use of violence, as if to hold Plaintiff to account for what Mr. Morgan perceived to be the content of those statements. Plaintiff made a number of attempts to change the subject but Mr. Morgan kept returning to it until Plaintiff was forced to leave the area.  Plaintiff then, seeing the nexus between his perceived religion, his PTSD disclosure, and the

endorsement of violence, began to get very distressed. Not only was Mr. Morgan engaging in "hostel questions meant to embarrass"[6] Plaintiff, the implicit accusation that Plaintiff was prone to violence was so highly disturbing to Plaintiff that it gave him nightmares and further exacerbated his PTSD symptoms. Plaintiff's distress "flow[ed] naturally from [Defendant's] act constituting the underlying tort[s]" of negligence and intentional infliction of emotional distress. See *Kamrath v. Suburban Nat. Bank*, 363 NW 2d 108, Minnesota Court of Appeals, (1985), at 112. In Minnesota, intentional infliction of emotional distress ("IIED") requires proof of the following four elements: (1) the conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) that distress was severe. See *Kelly v. City of Minneapolis,* 598 N.W. 2d 657, 663 (Minn. 1999). The severity of the emotional distress must be "so severe that no reasonable [person] could be expected to endure it." See *Hubbard v. United Press Int'l Inc.,* 330 N.W. 2d 428, 439 (Minn. 1983) (quoting Restatement (Second) of Torts § 46, cmt. j (1965)). Defendant's conduct toward Plaintiff in this instant case satisfies all four IIED elements and the distress Defendant inflicted on Plaintiff is "so severe that no reasonable person could be expected to endure it."

13.) After realizing that Chris Morgan was trying to hide and protect Magenta/Majentah Bloom from her criminally illegal behavior, and harass[7]

---

[6] See below *Rumble v. Fairview Health Services*, Dist. Court, Minnesota (2015)

Plaintiff out of Skateville, and would likely have success before Plaintiff could directly affect Ms. Bloom's unfortunate situation, on December 10, 2017, Plaintiff discretely notified Skateville's head manager, Florance Adams, that he was finding it difficult to tolerate Mr. Morgan's harassment[8] and disclosed to her that there was criminal conduct that Mr. Morgan was perceived to be protecting and encouraging, although Plaintiff did not disclose all of the details at that time for privacy reasons, but insinuated that police involvement may be appropriate.

14.) On January 31, 2018, Plaintiff began receiving online death threats and threats of great bodily harm from other Skateville club members and associates, who are "friends" with Magenta/Majentah Bloom and reasonably under the influence of Defendant, obviously due to the disagreements that formed between him and Ms. Bloom, and the whistleblower position Plaintiff had found himself in related to Ms. Bloom's criminally illegal conduct. Plaintiff then contacted Skateville "owner" Jason McKenzie to explain what was occurring and seek help in defusing the situation, after being referred to him by manager Florance Adams.

---

[7] See *Black v. Snyder*, 471 NW 2d 715, Minn: Court of Appeals (1991), at 721. "[Plaintiff] is entitled to assert this claim (under the MHRA) because the state's interest in eradicating [religious and disability] harassment in [places of public accommodation] is compelling." When the business environment is intimate and transactions ongoing, "there is no substantive difference between the two terms" "work place" and "place of public accommodation". See *Smallwood v. Illinois Cent. R. Co.*, 385 F. 3d 568, Court of Appeals, 5th Circuit (2004), footnotes [1].

[8] It is "possible to bring a claim for a hostile [business] environment under the ADA." *Shaver v. Independent Stave Co.*, 350 F. 3d 716, Court of Appeals, 8th Circuit (2003), at 719. Places of public accommodation are also liable for unreasonable disability treatment under the MHRA. See *Wenigar v. Johnson*, 712 NW 2d 190, Minn: Court of Appeals (2006).

Mr. Mckenzie stated to Plaintiff then that it was his policy not to get involved in disputes that occurred off Skateville's premises. Plaintiff was informed on February 2, 2018 that he was being trespassed from Skateville facilities for unspecified "business" reasons. The trespass notice Plaintiff received gave no further explanation. Mr. McKenzie later stated he sought to prevent Plaintiff from returning to Skateville to protect his business "image" and that the trespass notice stemmed from disputes Plaintiff had with other Skateville members online, even though he had previously and clearly stated to Plaintiff that it was his policy to not get involved with online activity. See *Vaughn v. Northwest Airlines, Inc.,* 558 NW 2d 736, Minn: Supreme Court 1997:

> "Before recovery is allowed on a theory of negligence, the defendant must owe a duty of care to the plaintiff. *Hudson v. Snyder Body, Inc.,* 326 N.W.2d 149, 157 (Minn.1982); W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53, at 356 (5th ed.1984) [hereinafter Prosser]. A duty is an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another. *Rasmussen v. Prudential Ins. Co.,* 277 Minn. 266, 268-69, 152 N.W. 2d 359, 362 (1967) (quoting Prosser § 53)."

Even in the absence of statutory discrimination, Defendant has a duty to act reasonably toward Plaintiff while conducting its publicly offered business. To deprive Plaintiff of its publicly offered business due to reasons of pretext not related to any cognizable business policy and based on Plaintiff's entirely legal conduct occurring within or outside of the purview of Defendant's business, is a

breach in the standard of conduct Defendant owes Plaintiff as a member of the general public, which Plaintiff has been injured by.

15.) On February 11, 2018, Plaintiff was falsely accused on the phone in front of other Skateville staff of "threatening to kill people at Skateville" by skating coach Chris Morgan. All indication is that Chris Morgan fabricated that rumor and disseminated it among other Skateville staff and club members to defame Plaintiff's character and generate the hate communications that Plaintiff has been receiving in various ways ever since. See *Stuempges v. Parke, Davis & Co.*, 297 NW 2d 252, Minn: Supreme Court (1980).

16.) Not only has Plaintiff suffered substantial distress from Defendant's conduct, Defendant has also managed to deprive Plaintiff of being able to form the necessary contacts at any previously available rink in order to compete again in tournaments, due to the poisoning of the roller skating community against Plaintiff with viciously defaming rumors. There is a close intermingling of club members from different skating clubs across the nation who compete against each other and it makes no sense whatsoever for Plaintiff to attempt roller skating club membership anywhere else in the vicinity until his good name is restored. Otherwise, Plaintiff will likely suffer the same treatment as he did at Skateville.

**WHEREFORE**, Plaintiff seeks compensatory damages in the amount of $120,000 for pain and suffering, and $60,000 in punitive damages, plus any future attorney costs.